**Herbert E. DICKSON, Appellant**

v.

**OFFICE OF PERSONNEL MANAGEMENT.**

**No. 85–6073.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 24, 1986.

Decided Sept. 4, 1987.

Eric R. Glitzenstein, with whom Alan B. Morrison, Arthur B. Spitzer, and Elizabeth Symonds, Washington, D.C., were on the brief, for appellant.

Edith S. Marshall, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MIKVA and BUCKLEY, Circuit Judges, and JAMES B. PARSONS,* United States Senior District Judge for the Northern District of Illinois.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

For more than a decade, appellant has repeatedly, and unsuccessfully, sought permanent employment in the competitive federal civil service. With each new application, the Office of Personnel Management ("OPM"), in its assigned role as the central personnel record keeping agency for the government, investigated and augmented appellant's personnel record. By the time Dickson filed suit in 1983, the record contained numerous layers of military and Veterans Administration reports, interviews with former employers, letters, and investigatory notes. Dickson alleges that some of this material incorporated false, derogatory, and highly prejudicial information. He sought to amend his personnel file and collect damages under the Privacy Act, and charged OPM with violating his right to Fifth Amendment due process.

The district court granted summary judgment in favor of the government on all counts.

We reverse in one respect. We hold that OPM is subject to a damage action whenever it maintains a record violating the standard of fairness mandated by the Privacy Act. The statute does not restrict damage actions against OPM, as argued by the government and accepted by the district court, to those instances where OPM itself makes the adverse determination. Hence, the agency may be found liable even when the record is compiled in OPM's capacity as the investigative unit for other federal agencies evaluating an applicant for employment. We affirm, however, the dismissal of appellant's action for injunctive relief under the Privacy Act. We also affirm the denial of the due process claim, but only on the ground that appellant received all the process he was due. Given this conclusion, we find it unnecessary to decide whether appellant here presents a cognizable liberty interest.

## I. Background

### A. OPM and Investigations of Prospective Federal Employees

Since it was established in 1978, OPM has served as the designated agency to evaluate the fitness of federal civil service applicants. In its dual capacity as investigator and record keeper, the agency accumulates vast quantities of personal information affecting an individual's opportunity to obtain employment with the government. It is the agency's obligation to compile these records that fixes the setting of this case and more generally highlights the practical import of the decision we reach today.

By law, the President may appoint persons to ascertain the fitness of civil service applicants as to their age, health, character, knowledge and ability for employment. 5 U.S.C. § 3301 (1982). Under Executive Order No. 10,450, 3 C.F.R. 936 (Comp.1949–53) (as amended), the President has del-

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

egated to OPM, *inter alia*, the authority previously exercised by the U.S. Civil Service Commission to investigate and determine the suitability of persons entering or employed in nonsensitive positions within the competitive civil service. OPM is also responsible for making a more thorough assessment of individuals seeking federal contracts or employment with access to classified information or restricted areas.

To comply with the Executive Order, OPM performs two types of background investigations: a "National Agency Check and Inquiry" ("NACI") and a "full field investigation." For nonsensitive positions, the NACI investigation suffices and indeed most of the background investigations performed by OPM are of this type, amounting to approximately 200,000 each year. Brief for Appellee at 1 n. 1.

In the event the NACI develops information indicating the possibility that an appointee to a nonsensitive position in the competitive service is unsuitable, or that an appointee to a nonsensitive position outside the competitive service in an agency which does not have investigative facilities to resolve such issues may be unsuitable, OPM will make such further personal investigation as necessary to enable the head of the department or agency or OPM, whichever has jurisdiction, to resolve the suitability question. Ordinarily this "limited personal investigation" (formerly called a "Merit 13" investigation when conducted by the Civil Service Commission) will not be the equivalent of a full field investigation, but will be limited to verifying or disproving the information that may be disqualifying. *Id.*

B. *Facts of this Case*

In 1971, appellant first applied for employment with the federal civil service. The Civil Service Commission made a preliminary determination that appellant's termination from two prior jobs and an honorable military discharge for psychiatric reasons might disqualify him from federal employment. Accordingly, the Commission conducted a Merit 13 investigation to verify or disprove the potentially disqualifying information. The following documents pertinent to this lawsuit were gathered during the investigation and placed in appellant's file:

1) An OPM investigator's report on appellant's termination as an officer from the Metropolitan Police Department. The report, based on police files and "other information," stated that appellant was fired because "he was not qualified to be a MPD police officer";

2) A similar report on appellant's termination from Pinkerton's Inc., which stated that he had been discharged "because of insubordination and failure to comply with a company policy";

3) An investigator's report excerpting from appellant's application for correction of his military records and Veterans Administration files;

4) A copy of a letter from the Chief of the MPD to Congressman Lawrence Hogan regarding the reasons for the MPD's discharge of appellant; and

5) A June 1979 honorable discharge form, known as a DD–214, which indicated that appellant had been discharged from the military for psychiatric reasons.

Brief for Appellee at 3; Brief for Appellant at 5–6. The Merit 13 investigation and report ultimately concluded that appellant was eligible for employment in the competitive federal service as a Junior Federal Assistant.

Also in 1971, after his termination from the police department but prior to the commencement of the Merit 13 investigation, Mr. Dickson appealed to the Air Force Board for the Correction of Military Records for an alteration of his discharge record. He alleged before the Board that he had purposefully "faked" nervous and psychiatric difficulties in order to obtain a military discharge, which he wanted for personal reasons. The Board upheld his appeal and ordered that the discharge record be amended effective August 1972 to delete the reference to psychiatric unsuitability for service. His record was revised to state that he had been discharged "for the convenience of the government." Brief for Appellant at 6.

In 1972 and 1974, appellant was again the subject of a background investigation. Both times he was found suitable for federal service, first as a Federal Protective Officer and then with the U.S. Park Police, notwithstanding agency objections based on his record. Later in 1974, appellant's file was forwarded to the General Services Administration with the outdated DD–214 discharge still included. The agency objected to hiring him. Brief for Appellant at 6. The Civil Service Commission sustained the objection, but appellant remained eligible for future government employment.[1]

In 1979, OPM initiated an NACI investigation of appellant subsequent to his employment by the U.S. Postal Service. A report of a psychiatric examination conducted by the military was among the information received. The investigation was terminated when appellant resigned from the Postal Service, apparently due to injuries received in a car accident. Brief for Appellee at 6.

In 1981, appellant was temporarily hired by the Defense Mapping Agency and Hydrographic Topographic Center ("DMAHTC"). An NACI investigation added more information to appellant's personnel file, including:

1) A written response from a confidential source concerning the grounds for appellant's termination by the Postal Service in 1979;

2) A similar response to an inquiry from OPM regarding appellant's termination by the Postal Service in 1981;

3) A written response concerning appellant's termination from employment at the Washington Cathedral, where he had worked between 1976 and 1978, which said appellant was discharged because he was "excessively unavailable for duty";

4) Coast Guard and Air Force responses to requests for military record information; and

5) A May 1970 psychiatric evaluation from official records of the Veterans Administration.

Brief for Appellee at 7; Brief for Appellant at 6.

Appellant's augmented file was sent to the DMAHTC. The file included the original, outdated DD–214 form stating that appellant had been discharged from military service because of psychiatric reasons. Shortly after receiving the file from OPM, the DMAHTC terminated appellant's employment. OPM subsequently agreed to notify the agency that the discharge form was improperly forwarded, Brief for Appellee at 8–9, but claims that appellant, by his own testimony, has acknowledged the termination resulted from excessive absences. *Id.* at 7.

Appellant then filed a request under the Privacy Act, 5 U.S.C. § 552a, asking OPM for the entire contents of his personnel file. Based on a review of the material, appellant concluded that the file contained a "number of grave inaccuracies and half-truths," especially due to inclusion of negative comments on his work performance. He also objected to the retention of the DD–214 form. By letter of February 4, 1983, appellant made a request under section d(1) of the Privacy Act, 5 U.S.C. § 552a(d)(1), asking OPM to correct his file. OPM by reply letter agreed that it would not release the file to any requesting agency during a thirty-day period of review.

The agency violated the thirty-day agreement when it sent appellant's entire personnel file, including the DD–214 form, to the Smithsonian Institution, where appellant had secured temporary employment as a security guard. OPM pleads that the file was "inadvertently released." Brief for Appellee at 8. The agency admits that "Smithsonian officials determined, based upon [the file] contents, that Mr. Dickson's employment should be terminated." OPM contends, however, that "appellant's on-

---

1. We note that section (g)(5) in pertinent part expressly prohibits actions for disclosure of a record made prior to September 27, 1975:

    Nothing in this section shall be construed to authorize any civil action by reason of any injury sustained as the result of a disclosure of a record prior to September 27, 1975.

    5 U.S.C. § 552a(g)(5) (1982).

the-job conduct provided an independent basis for termination of his employment, and it was on this basis that he actually was terminated." *Id.*

In April 1983, almost three months after appellant's request for corrections, and following his termination from the Smithsonian, OPM agreed to remove the old DD–214 and replace it with an accurate discharge form. OPM refused to make other changes in appellant's file regarding his past employment history, but OPM agreed to place appellant's February 1983 letter in his file and informed appellant of his right to appeal the partial denial of his amendment request within the agency. Appellant did not pursue an administrative appeal.

Appellant filed a complaint in district court on November 23, 1983, alleging that the OPM file concerning him contained inaccurate, incomplete, and prejudicial information, and that its compilation, maintenance, and disclosure to potential federal employers violated his rights under the Privacy Act, the Administrative Procedure Act, and the due process clause of the Fifth Amendment. Appellant sought injunctive relief—to amend his files, or, in the alternative, to afford him "adequate opportunity to rebut the derogatory reports"—and damages.

In 1984, appellant requested that OPM declare him eligible to obtain another security guard position. During the investigation, appellant's eligibility for federal employment was placed "on hold." Brief for Appellant at 8. It is unclear from the briefs if this "hold" continues in effect.

On August 20, 1985, the district court granted appellee's motion for summary judgment. The court ruled that appellant's Privacy Act claim for injunctive relief (i.e., amendments to his personnel file) was barred because he did not exhaust his administrative remedies. The damage claim was dismissed based on the trial court's interpretation of the statute as precluding liability when the agency collecting information does not itself make the adverse personnel decision. Finally, the court held that appellant did not demonstrate a cognizable liberty interest, and in any event the Privacy Act and OPM internal procedures gave appellant a full and fair hearing on his claims. Appellant challenges all three holdings in the present appeal.

## II. DISCUSSION

### A. *OPM Liability for Damages Under the Privacy Act*

#### 1. Introduction

When an agency makes an adverse determination, such as a refusal to hire, and the determination is based on a record that is not maintained with "such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness," the aggrieved individual has a cause of action for damages. 5 U.S.C. § 552a(g)(1)(C) & (g)(4). The issue here is whether section (g)(1)(C) also creates a civil remedy when the agency maintains a challenged record that is the basis of an adverse determination made by another party. In the present case OPM maintained a record on appellant, yet it was the agencies receiving the record provided by OPM that made the adverse employment decisions.

OPM contends, and the district court agreed, that the structure and legislative history of the Act compel the conclusion that section (g)(1)(C) in essence reads as follows: When an agency fails to maintain a proper record and consequently an adverse determination is made *by that agency*, an individual may bring a civil action. Brief for Appellee at 25–29. On this reading, appellant's damage action against OPM must necessarily be dismissed. Appellant argues on the contrary that the Act creates a cause of action against the agency that improperly *maintains* a record. The suit is conditioned only on a finding that a subsequent adverse determination is made, by that or any other agency, based on the record at issue.

In resolving this issue of statutory construction, we find that the plain meaning of section (g)(1)(C) and the structure of the Act authorize a damage suit against OPM. Because these traditional tools of statutory construction firmly indicate congressional

intent, we have no need to consult the legislative history.

### 2. The Plain Meaning of Section (g)(1)(C)

We start, as we must, with the relevant statutory language:

Whenever any agency

\* \* \*

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and *consequently a determination is made which is adverse to the individual;* ...

\* \* \*

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction....

5 U.S.C. § 552a(g)(1)(C) (emphasis added). (The phrase *"reasonably* necessary to assure fairness" appears in the otherwise identical specification of the fairness standard in 5 U.S.C. § 552a(e)(5) (emphasis added), which defines the standard agencies are required to meet in maintaining records for their own use. We have recently held that this variation between section (e)(5) and (g)(1)(C) is not of "substantive significance." *Doe v. United States,* 821 F.2d 694, 698 n. 10 (D.C.Cir.1987) (en banc)).

Section (g)(4) states the standards governing the substantive requirements for a damage action. Appellant must prove that the failure to maintain records of the requisite fairness was "intentional or willful." 5 U.S.C. § 552a(g)(4);[2] *see Albright v. United States,* 732 F.2d 181, 188–90 (D.C.Cir.

1984). The adverse effect must be proximately caused by the Privacy Act violation. *Molerio v. FBI,* 749 F.2d 815, 826 (D.C.Cir. 1984); *Albright,* 732 F.2d at 186–88. Plaintiffs must prove actual damages, or alternatively, their entitlement to the $1,000 minimum recovery specified in the statute. 732 F.2d at 184.

By its terms, section (g)(1)(C) carves out no special exception or waiver selectively immunizing agencies from civil actions. Rather, in a straightforward manner, the Act establishes a predicate condition that records be maintained with requisite fairness. Jurisdiction in the district court attaches and a suit can be brought if, based on the unfair record, "a determination is made which is adverse to the individual."

The critical phrase "consequently a determination is made" means that the adverse determination need not be made by OPM in order for a damage action to properly lie. This choice of grammar, which is the only time the passive voice is used in the section dealing with civil remedies, unambiguously subjects OPM to a damage action when an adverse determination "is made," whether by OPM or by another agency.

### 3. The Structure of the Privacy Act

The government would have us start from the premise that the meaning of section (g)(1)(C) is ambiguous and therefore congressional intent must be sought in the structure of the Act and the legislative history. Even were we to accept this proposition, which we do not, the government still loses.

The essence of OPM's reading, accepted in error by the district court, is that section (g)(1)(C) cannot be read to impose a substantive record keeping obligation "beyond

---

**2.** (4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—

(A) actual damages sustained by the individual as a result of the refusal or failure, but

in no case shall a person entitled to recovery receive less than the sum of $1,000; and

(B) the costs of the action together with reasonable attorney fees as determined by the court.

5 U.S.C. § 552a(g)(4).

the scope of the 'agency requirements' imposed by § 552a(e) of the Act." [3]  Brief for Appellee at 24 (emphasis omitted).  OPM relies for this argument on *Perry v. FBI*, 759 F.2d 1271 (7th Cir.1985), *rev'd en banc on other grounds*, 781 F.2d 1294, *cert. denied*, —— U.S. ——, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986), where the Seventh Circuit held that section (e)(5) imposes responsibility for ensuring that information is "accurate, relevant, timely, and complete" on the "receiving agency—the agency making the 'determination' about the person in question—not the sending agency." 759 F.2d at 1275 (footnote omitted).

The court based this argument on two principal grounds.  First, the wording of section (e)(5), in the court's view, imposes a duty of record keeping fairness only on those agencies that actually make a "determination." *Id.*  In *Perry*, the sending agency was the FBI.  Because it only forwarded a record for use by another agency, the court said the FBI itself made no determination.  Conversely, said the court, the agency that receives the record and makes an adverse employment decision is responsible for ensuring the fairness of the record.  Second, the court read section (e)(6) of the Act to obligate any agency, even the sending agency that does not itself make a "determination," to maintain a record fairly when it disseminates the record to "anyone *other than an agency.*" *Id.* (emphasis in original).[4]  Reasoning by

exclusion, the court concluded that Congress did not intend to place a similar obligation on agency-to-agency transfers. *Id.*

This holding, which we have no occasion to review, is irrelevant to the present dispute.  Appellant is not proceeding under section (e)(5), *Perry* does not discuss section (g)(1)(C), and the construction of (e)(5) does not migrate by logic or statutory mandate to a separate section on civil remedies.  To the contrary, the structure of the Act makes it abundantly clear that section (g) civil remedy actions operate independently of the obligations imposed on agency record keeping pursuant to section (e)(5).

The Privacy Act protects individuals from injury that can result from the bureaucratic habit of collecting and retaining information, however dated, prejudicial, or false.  The Act does so in three ways relevant to understanding section (g)(1)(C):

—Section (e) instructs agencies on their record keeping obligations;

—Section (d) grants individuals the right to inspect those records;[5] and

—Section (g) provides individuals with remedies in the event they believe information in the records is inaccurate or prejudicial; these remedies include the right to seek correction of records pursuant to section (g)(2)(A), and the right to damages (under section (g)(4)) for any injury that results from the willful or intentional failure of an agency to meet

3.  Each agency that maintains a system of records shall—
    *  *  *  *  *  *
    (5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination; ....
    5 U.S.C. § 552(e)(5).

4.  Section (e)(6) reads in pertinent part:
    Each agency that maintains a system of records shall—
    *  *  *  *  *  *
    (6) prior to disseminating any record about an individual to any person other than an agency ... make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes;

. . . .
5 U.S.C. § 552a(e)(6).

5.  Section (d) states in pertinent part:
    Each agency that maintains a system of records shall—
    (1) upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him and upon his request, a person of his own choosing to accompany him, to review the record and have a copy made of all or any portion thereof in a form comprehensible to him, except that the agency may require the individual to furnish a written statement authorizing discussion of that individual's record in the accompanying person's presence;
    . . . .
    5 U.S.C. § 552a(d)(1).

the standard set forth in (g)(1)(C).[6] *Cf. Doe v. United States*, 821 F.2d at 697.

For purposes of the present dispute, the essential point is that the statute affords section (g) civil remedies for violation of the Privacy Act distinct and apart from the section (e) obligation laid upon agencies to maintain accurate records. This bifurcation of agency obligation and available remedy rebuts the government's effort to modify the Act's straightforward grant of a damage remedy.

The government also overlooks that in no instance do the civil remedies afforded to individuals incorporate section (e) by reference. By contrast, the statute expressly limits the judicial remedies available under section (g)(1)(A) and (B) to violations of other named sections of the Act. Section (C) also could have been so restricted. Furthermore, OPM's construction reduces section (C) to "mere surplusage," *Symons v. Chrysler Corp. Loan Guarantee Bd.*, 670 F.2d 238, 242 (D.C.Cir.1981), as it would then duplicate the coverage provided by the catch-all provision of section (g)(1)(D), which authorizes a civil remedy whenever "any other provision of this section" is violated. Section (g)(4) in turn expressly authorizes a *damage* action for a violation of (g)(1)(C) *or* (g)(1)(D).

Finally, the broad scope of coverage of the Privacy Act makes it presumptively unlikely that Congress intended to grant so sweeping an exclusion by indirection. It would be inconsistent with the general purpose of the Act to promote fairness in record keeping. It is inconsistent with the expansive wording of section (g)(1)(C) in particular, which creates a civil remedy action whenever *"any agency"* fails to main-tain *"any record"* in such manner as to assure "fairness in *any determination* relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record...." 5 U.S.C. § 552(g)(1)(C) (emphasis added). In this context, the contrary argument put forward by the government is particularly unpersuasive.

### 4. Legislative History

Finally, OPM would have this court rely on two sentences from the House and Senate Reports which ostensibly demonstrate that "the agency against which suit is brought must be the agency that makes the determination giving rise to a claim for damages." Brief for Appellee at 28.

For example, in the section that became (g)(1)(C), the House draft specified that "an action also lies if the agency makes an adverse determination based on a record which is inaccurate, untimely, or incomplete." H.R.Rep. No. 1416, 93d Cong., 2d Sess. 17 (1974). Appellant says the change to the passive voice in the Act indicates an intent to broaden its coverage. OPM responds that the House draft expresses Congress' true intent and that a significant change in policy would have been accompanied by an explanation. Congressional silence, concludes OPM, means no change in meaning was intended by the change in wording.

The omnipresent hazard of misreading legislative history reaches an apotheosis of sorts in the argument made here. Based on scraps of language, never construed to apply to the precise issue at hand, OPM

---

**6.** Whenever any agency

(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

(B) refuses to comply with an individual request under subsection (d)(1) of this section;

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

5 U.S.C. § 552a(g)(1).

seeks to vary the otherwise plain meaning of the statute. We have elsewhere noted the hazard of this casual approach to legislative history. *See International Bhd. of Elec. Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697, 717 (D.C.Cir.1987) (Buckley, J., concurring). In this case, the barren record falls of its own weight. We write only to emphasize the paramount need to respect the words actually written in the law itself. *See Board of Governors of the Fed. Reserve Sys. v. Dimension Financial Corp.*, 474 U.S. 361, 106 S.Ct. 681, 686–89, 88 L.Ed.2d 691 (1986); *United States v. Clarke*, 445 U.S. 253, 254, 258 n. 4, 100 S.Ct. 1127, 1128, 1131 n. 4, 63 L.Ed.2d 373 (1980); *Abourezk v. Reagan*, 785 F.2d 1043, 1054 n. 11 (D.C.Cir.), *cert. granted*, — U.S. ——, 107 S.Ct. 666, 93 L.Ed.2d 718 (1986).

B. *Section (g)(1)(A) and Exhaustion of Administrative Remedies*

■ Section (d) of the Privacy Act, 5 U.S.C. § 552a(d), sets forth explicit steps that must be taken before a party may file for injunctive relief in district court pursuant to section (g)(1)(A), 5 U.S.C. § 552a(g)(1)(A). Appellant started the process with a request for correction. Appellee did not respond until almost ninety days later. This is well beyond the twenty-day period specified by OPM regulations, 5 C.F.R. § 297.306(b) (1986), and according to appellant, not within the statutory requirement of a prompt response, 5 U.S.C. § 552a(d)(2)(B). As noted by appellee, however, Dickson raises this point for the first time on appeal. Brief for Appellee at 21–22. OPM informed appellant that the improper discharge form would be removed from his file, but no other changes would be made in the absence of evidence supporting appellant's charges. The requisite next step would have been higher level review of the agency determination, 5 U.S.C. § 552a(d)(3), after which appellant, if still unsatisfied, would have exhausted his search for an administrative remedy and been entitled to seek injunctive relief in the district court. 5 U.S.C. §§ 552a(g)(1)(A), (2)(A).

Appellant never sought higher administrative review. Instead he filed a complaint in federal court. Appellant concedes he did not follow the steps mandated in the statute, but argues that as a matter of equity he properly sought judicial relief. Specifically, he alleges the untimely response from OPM and the improper release of his file to the Smithsonian demonstrated bad faith and confirmed that it would have been futile to pursue an administrative remedy. The argument is without merit.

The statute provides no exemption from administrative review when an agency fails, even by several months, to abide by a deadline, and none is reasonably implied. *See, e.g., Nagel v. United States Dep't of Health, Educ. and Welfare*, 725 F.2d 1438, 1440–41 (D.C.Cir.1984) (exhaustion of remedies prerequisite for suit to compel amendment). Nor do exceptional circumstances warrant consideration of the issue when raised so late in the litigation. *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084–85 (D.C.Cir.1984). The Privacy Act itself represents the compromise reached by Congress between a citizen's right to correct inaccurate records and the government's need to assemble critical information for responsible employment decisionmaking. It is not within the province of the court to upset this delicate balance through premature review. To hear appellant's claim, we would invade the obligation to make policy judgments committed in the first instance to the record keeping agency. *Cf. Athlone Industries, Inc. v. Consumer Product Safety Comm'n*, 707 F.2d 1485, 1488 (D.C.Cir.1983) (rationale of exhaustion doctrine to prevent premature interference with agency process). In addition, no evidence in this case supports appellant's conclusory allegation that appeal would have been futile.

Appellant cites *Harper v. Kobelinski*, 589 F.2d 721 (D.C.Cir.1978), as evidence that this court will allow suit to be brought under the Privacy Act even where administrative remedies have not been exhausted. Reply Brief for Appellant at 2. The case is not on point because the court there determined that the record keeping agency violated the Act's statutory mandate in not

informing appellant of his right to administrative review. 589 F.2d at 723. As noted, OPM's April 23, 1983 letter specifically informed appellant of his right to review. The decision is not authority to ignore the Act's carefully detailed system of agency review. Moreover, the court in *Harper* remanded to the district court pending further consideration of appellant's claim by the agency. *Id.*

Accordingly, the district court's determination that appellant failed to exhaust administrative remedies, and therefore was barred from seeking injunctive relief, is affirmed.

### C. *Due Process Liberty Interest*

■ Because we conclude that appellant received all the process he was due, and therefore is not entitled to any relief based on the Fifth Amendment, we affirm the district court as to the constitutional claim without deciding the question whether appellant has in fact been deprived of a protected liberty interest. *Cf. Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (Fourteenth Amendment due process satisfied); *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84–85, 98 S.Ct. 948, 952, 55 L.Ed.2d 124 (1978) (same).

The specific remedy appellant seeks is the opportunity to refute the allegedly erroneous information in his personnel file. He argues that the constitutional assurance of due process extends in this case to a right of oral hearing. In addition, appellant claims the government has a constitutional obligation to give notice prior to entering potentially damaging information in a file.

Due process is a flexible concept, tailored to provide a meaningful opportunity to be heard, but satisfied by no fixed formula. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Appellant makes no serious argument, and there is none, that the incidents recorded in the OPM file cannot be adequately disputed through documentary evidence. Nor can appellant make the case that the government must give advance notice before placing damaging evidence in someone's file. *See* Reply Brief for Appellant at 12. The opportunity to refute incorrect charges is not diminished absent advance notice.

Moreover, even if appellant suffered serious injury, due process analysis must still weigh "the risk of an erroneous deprivation of such [a private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards" and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) (citation omitted). As the *en banc* panel held in *Perry*, "[t]he burden on the government ... would not only be enormous, but also misguided." *Perry*, 781 F.2d at 1304. This is especially true in a case where appellant alleges that his records are incomplete and therefore misleading. To give a right to oral hearing or advance notice in this circumstance would disable government record keeping.

These points defeated, appellant asks for no more than the right to submit evidence. Yet this relief he seeks under the Due Process Clause is precisely equivalent to that afforded him as of right under the Privacy Act. We have no occasion to decide whether as a general proposition the Privacy Act defines the scope of remedies available under the Constitution. Rather, in the circumstances of this case, we find that the procedures afforded appellant by the Act satisfied his constitutional due process rights, again assuming *arguendo* that such rights indeed exist. *Cf. Arnett v. Kennedy*, 416 U.S. 134, 157, 94 S.Ct. 1633, 1646, 40 L.Ed.2d 15 (Rehnquist, J., plurality opinion) (Fifth Amendment due process liberty interests satisfied by appeal procedures of Lloyd-LaFollette Act and companion regulations), *reh'g denied*, 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974).

Appellant was notified by letter of April 26, 1983 that he had the opportunity for further review. OPM promised and performed on its promise to include in appel-

lant's file his detailed refutation of all defamatory or prejudicial statements included therein. OPM also agreed to remove the outdated DD–214 form from his record. The agency's delayed performance on this count does not call into question the adequacy of the process. Moreover, appellant was encouraged by OPM to submit evidence, if any existed, that would specifically refute allegations contained in his personnel file. Due process is defined in this context as the opportunity to clear one's name. *Arnett*, 416 U.S. at 157, 94 S.Ct. at 1646; *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 n. 12, 92 S.Ct. 2701, 2707 n. 12, 33 L.Ed.2d 548 (1972). Appellant has had ample opportunity to do so. *See Doe v. Casey*, 796 F.2d 1508, 1524 (D.C.Cir.1986) (holding due process satisfied by notice, examination of evidence and submission of arguments in rebuttal when a homosexual employee was discharged from the CIA because he presented a security risk), *cert. granted, Webster v. Doe,* —— U.S. ——, 107 S.Ct. 3182, 96 L.Ed.2d 671 (1987).

In short, as in *Perry*, we conclude that on objecting to the content of files pertaining to him, appellant received the "full measure of the process he is due." *Perry*, 781 F.2d at 1303.

We also note, but dismiss on its face, appellee's argument that third parties such as former employers, not the government, were the source of the comments objectionable to appellant. Therefore, goes the argument, there was no government defamation and hence no due process claim. Brief for Appellee at 45–47. It is sufficient to note that OPM investigators compiled many of the reports at issue here, OPM itself chose to retain the old discharge form, and OPM made the decision to send appellant's file to the Smithsonian. *Cf. Perry*, 759 F.2d at 1275 n. 6 (" 'Record' is defined as 'any item, collection, or grouping of information about an individual that is maintained by an agency.' 5 U.S.C. § 552a(a)(4). And 'maintaining' a record includes collecting it. 5 U.S.C. § 552a(a)(3).").

## III. Conclusion

We reverse the district court's determination that section (e)(5) of the Act insulates OPM from damage suits. On remand, the district court must determine if appellant has carried the burden of showing the OPM records were not maintained with the fairness mandated by section (g)(1)(C), and if so, whether the failure was 1) intentional or willful and 2) the proximate cause of an adverse determination.

Accordingly, the judgment of the district court is

*Affirmed in part, reversed and remanded in part.*