Roger **PILON**, Plaintiff,

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Defendant.**

**Civ. A. No. 90–2794 (HHG).**

United States District Court, District of Columbia.

May 28, 1992.

Matthew L. Myers, Asbill, Junkin, Myers & Buffone, Washington, D.C., for plaintiff.

Paul F. Figley, Jeffrey Axelrad, Attys., Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

This case involves one of the more disturbing phenomena of the Washington scene—the leaking [1] of false information to damage the reputation or livelihood of an official. The events revealed by this case [2]

---

1. To "leak" is synonymous in this context with divulge, disclose, make public. Random House Thesaurus (College ed.) In Washington parlance, it is usually thought of as the surreptitious disclosure of information to the press for political or bureaucratic advantage.

2. The facts herein are taken from the plaintiff's papers which, as defendant concedes, must be taken as true for purposes of the Department's motion to dismiss. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94

S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). As to many, if not most, of these facts, the Department's papers do not disagree.

As to defendant's motion for summary judgment, plaintiff has submitted a declaration specifically averring facts which contradict those averred by the Department, in addition to relying on documents submitted by the Department. Under such circumstances, factual issues in dispute must be resolved in favor of the non-moving party. *Lujan v. Nat'l Wildlife Fed.,* 497 U.S. 871, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990).

are particularly egregious for several reasons.

First, although it was officially determined several times that the target of the leaks had done nothing wrong, the false leaks began anew after every such determination, and even after a formal settlement agreement of no wrongdoing had been reached between that target and the government. Second, those providing the leaks were personnel of the Department of Justice. By virtue of their employment at an agency at the heart of the administration of justice, these individuals were under a special duty to be careful not to violate the rights of individuals.[3] Third, in actions reminiscent of Franz Kafka's novel *The Trial*, Department of Justice officials leaked confidential information concerning plaintiff with considerable abandon (*see* Section I, *infra*),[4] while at the same time plaintiff was told that he could not be allowed access to the facts underlying the investigation the government had conducted of him (*see* note 5, *infra*).

### I

In January 1988, while plaintiff Roger Pilon held the position of Director of the Asylum Policy and Review Unit of the Department of Justice, and while his wife was under investigation for clearance in connection with her then-pending nomination as Assistant Secretary for Territorial and International Affairs in the Department of the Interior, FBI agents accused Pilon of having provided a classified State Department document on South Africa to his wife,

and Mrs. Pilon of having given this document to South African government officials.[5] In June 1988, the Pilons were advised by a Justice Department official that Mr. Pilon was to resign his position or be fired. Shortly thereafter, Mr. Pilon's attorney was allowed a limited review of the classified investigation [6] on the curious conditions that he not disclose any of the information to his client and that he end his representation of the Pilons after drafting an analysis of the allegations for the consideration of the Attorney General.

Eventually, following a review by Pilon's lawyer, the Attorney General ordered a *de novo* investigation of the entire matter. Following that investigation, Principal Associate Deputy Attorney General Dee V. Benson, with the approval of the then Acting Deputy Attorney General, wrote to Pilon fully clearing him of any wrongdoing and informing him that no implication adverse to him should be taken from the investigation.[7] Pilon was also unconditionally reinstated in his former position and his top secret security clearance was restored.

Notwithstanding this reinstatement, the Office of Professional Responsibility (OPR) (which was responsible for the initial investigation of Pilon) in its 1988 Annual Report to the Attorney General provided a description of the Pilon investigation, concluding (1) that the investigation had discovered sufficient cause for the termination of Pilon's political appointment, and (2) that Pilon had resigned prior to the initiation of the removal proceedings.[8] Both of these

3. The Department is also the agency that prosecutes individuals for unauthorized disclosures of classified and other materials.

4. However, some officials, *e.g.,* former Attorney General Richard Thornburgh, took special care to attempt to repair the damage done by the leaks. *See* pp. 9–10, *infra.*

5. Pilon states that he and his wife were told that they were not entitled to know the basis for the allegations against them, and that to the present they have not been informed what prompted the charge or how they were linked to the document. Pilon Affidavit at ¶ 15.

6. The attorney had a security clearance.

7. While the investigation was proceeding there was another leak of information allegedly "available only to internal Department of Justice personnel," this time to a reporter for ABC News. There also was said to have been a leak by Justice officials to the *Washington Post* (Pilon Affidavit at ¶ 8) as a result of which Mrs. Pilon withdrew her nomination to the post in the Department of the Interior.

8. While the report did not use Pilon's name, he was otherwise clearly identified, and newspaper reporters telephoned him immediately following the report's publication. The media published the fact of the Pilon espionage investigation the following day.

Thus, the *New York Times* article of November 10, 1989 (submitted to the Court with a

conclusions were false, and they were contrary to the determination made by the Principal Associate Deputy Attorney General.

Upon entreaties by Pilon's attorney, Deputy Attorney General Donald Ayer, too, undertook an investigation of the matter, and on March 16, 1990, he, too, wrote to Pilon that there was no basis for his dismissal from his position,[9] and that, in fact, he had been invited to return to his post unconditionally.[10]

On July 12, 1990, Pilon and the Department of Justice entered into a stipulation for a compromise settlement to resolve Pilon's claims against the Department. The settlement was accompanied by a check to Pilon for $25,000 and a public letter of apology to him which stated that Pilon's resignation was self-initiated and not caused by any contemplated removal proceedings.[11]

Unfortunately, the settlement did not end the controversy. To the contrary; the leaks by Justice Department personnel damaging to Pilon's reputation continued.

On October 5, 1990, Pilon and his attorney were separately contacted by telephone by James Rowley, a reporter who covered the Department of Justice for the Associated Press. Mr. Rowley stated that he had been given several internal classified Department of Justice records pertaining to Pilon,[12] one of which was a memorandum from Deputy Attorney General Ayer to Attorney General Thornburgh, in which Mr. Ayer was reported to have stated that a senior career Department attorney had concluded that there was sufficient evidence to justify Pilon's firing. The Associated Press story based on Rowley's information also revealed that several Department lawyers had allegedly found that Pilon had been reinstated despite sufficient evidence to justify his dismissal. The article also cited "several top officials"[13] of the Department for additional information regarding the Pilon resignation.

Pilon brought this damages action after he left the Department,[14] claiming substantial adverse effects, and the Department moved to dismiss or in the alternative for summary judgment. It is that motion that is now before the Court.

## II

The principal argument advanced in the Department's motion for summary judgment is that Pilon's Privacy Act claim concerning the Fall 1990 disclosures is barred by the settlement agreement of July 12, 1990.

 The Court rejects that contention. The Department is correct in its claim that a settlement agreement is a contract and should be applied in accordance with its terms under contract law. *See generally,* Corbin on Contracts § 1288. Where the Department's position goes astray, however, is in its insistence that the settlement

---

Department declaration) states that while the "report did not identify Mr. Pilon by name ... several former officials of the department said Mr. Pilon had been investigated" on charges of providing a State Department document to the South African government.

9. Mr. Ayer also stated that plaintiff was "entitled to an apology."

10. On May 20, 1990, the *Los Angeles Times* wrote a "newly leaked" story which considered the culpability of the Office of Professional Responsibility (OPR) regarding the Pilon matter, and which intimated that Deputy Attorney General Ayer had resigned from the Department partly over a dispute with Attorney General Richard Thornburgh on the same subject. (Mr. Ayer had written to plaintiff's attorney holding the OPR blameless—a judgment with which the Attorney General apparently disagreed.)

11. The settlement agreement was accompanied by a formal Justice Department statement referring to "our previous errors" and the "improper disclosure" of the Pilons' identities. Assistant Attorney General Stuart M. Gerson wrote that he had reached the same conclusion as Mr. Ayer.

12. Plaintiff alleges that the documents were "available only to a limited number of individuals within the Department of Justice."

13. The officials were not identified because they spoke on "condition of anonymity."

14. Following his Department of Justice experience, Pilon joined the Cato Institute, a conservative think-tank.

agreement here applies to the Fall 1990 disclosures because, inasmuch as the agreement provides that it was to "settle and compromise all claims, whether known or unknown, existing on or before the date of this agreement," it also covers claims arising out of a subsequent public disclosure.

Two cases are cited by the Department as providing a "helpful framework for analysis" on this issue[15]—*Keith v. Aldridge*, 900 F.2d 736 (4th Cir.1990), and *Fisher v. Owens–Corning Fiberglass Corp.*, 868 F.2d 1175 (10th Cir.1989). A review of the opinions in those cases reveals that they do not support the Department's position. In *Keith*, after settling an action, the plaintiff filed a second action predicated on the identical facts, and it was held that the settlement barred the second suit. Here, of course, the suit is based on wholly different operative facts: allegedly wrongful disclosures which (1) were made after the execution of the settlement agreement, and (2) were separate from the earlier disclosures. As for *Fisher*, the settlement covered certain diseases allegedly caused by exposure to asbestos. That settlement agreement covered all claims known or unknown, developed or undeveloped, growing out of the physical harm allegedly due to the exposure to asbestos, and there, too, the court held that the second action was barred. But there, again, there was only one event—the exposure to asbestos—not, as here, a second event—the new disclosures subsequent to the execution of the agreement.

If there were any doubt about this conclusion, it is dispelled by the language of the settlement agreement itself. That agreement provides specifically that it applies only to claims "existing on or before the date" of that agreement. Obviously, the wrongful conduct of allegedly engaged in by Department of Justice personnel *three months after* the settlement agreement was executed had not given rise to a claim existing on the date of that agreement.

Finally, on this issue, it is noteworthy that the original draft agreement submitted by the Department of Justice to Pilon contained language that it was to cover any claims that the latter "may have or hereafter acquire against the United States," but the Pilons rejected that draft in favor of the present language; *i.e.*, claims the Pilons "may have as of the date this Agreement is executed."

In short, there can be no doubt but that by the settlement agreement the Pilons did not waive their rights with respect to future improper disclosures, nor did they grant license to the Department by that agreement in perpetuity to disclose confidential information concerning them in violation of the Privacy Act.

### III

The Department next advances a number of miscellaneous arguments which can be disposed of more briefly.

It is asserted that the information disclosed by the Department's personnel was already public, and that the disclosure therefore could not violate the Privacy Act. That contention, too, is unpersuasive.

In the first place, the issue whether the information was already public is a factual one specifically disputed between the parties, and it is therefore inappropriate for summary judgment on that basis alone. Plaintiff has not yet had the opportunity for discovery and has not even seen the documents that were released. In that posture, it would be particularly improper as well as unfair to cut off his possible avenues toward relief.

Second, even if it be assumed that the factual issue may be resolved at this stage against plaintiff, it would not assist the Department's position. The previously disclosed false information was subsequently retracted by the Department as untrue. There is an obvious distinction between the republication of a fact previously disclosed and never retracted on the one hand, and a publication of a statement previously publicly disavowed as false, on

**15.** Defendant's Memorandum at 14.

the other. It would make no sense to regard the republication in the latter context as somehow privileged, and the Court rejects the argument that it is.[16] None of the cases cited by the Department involved the republication of "facts" following their disavowal by the party publishing them although, to be sure, there are no cases to the contrary. This is so presumably because the activities of the Department officials claimed to have occurred here are so peculiar—retraction followed by republication—that there are few, if any, factual precedents.

■ Third, the Department argues that there could have been no Privacy Act violation because the "leakers" obtained the information from their own personal recollections, as distinguished from governmental records. The difficulty is that the leaks obviously stem from confidential Department documents and oral statements derived therefrom.[17] Further, the law is established that the Act applies even if the particular government agent did not physically remove the record from the official record system. *Bartel v. Federal Aviation Administration*, 725 F.2d 1403, 1408–11 (D.C.Cir.1984).

■ Fourth, the Department argues in its surreply that the leaks were not properly established even for purposes of an opposition to a motion for summary judgment because statements attributed to reporters attesting to the receipt of information from government officials were hearsay. The Court has not been advised how the victim of gross Privacy Act violations accomplished by leaks to news media could ever begin to secure redress if such statements are to be considered inadmissible. Presumably the Department does not suggest that such violations are to be de facto exempt from the Privacy Act strictures.

■ Fifth, the Court finally rejects the Department's contention that it is entitled to summary judgment because plaintiff has not demonstrated disclosures by the "agency." *See Olberding v. U.S. Dept. of Defense*, 709 F.2d 621 (8th Cir.1983). This contention is premature. The issue before the Court is whether the complaint can withstand a motion for summary judgment; it clearly can. A number of the facts published in the media were specifically alleged to have been "closely held within the Department and available only to a limited number of departmental officials." Pilon Affidavit at ¶ 17. Indeed, one of the documents at issue was said by the Department to bear a "Top Secret" classification and to have been read only by eleven Department of Justice officials. Plaintiff's Response of March 22, 1991. Following discovery and a trial, it may be decided whether, as a matter of contested fact, an agency release occurred.

For the reasons stated, the Department's motion will be denied with respect to plaintiff's first claim.

### IV

■ In a separate claim plaintiff asserts that the Department violated his rights when, contrary to 5 U.S.C. § 552a(e)(10), it failed to "establish appropriate administrative, technical and physical safeguards to insure the security and confidentiality of records." In the view of the Court, a valid claim is stated when it is properly pleaded that the agency has acted in a manner which was intentional or willful. 5 U.S.C. § 552a(g)(4); *Kostyu v. United States*, 742 F.Supp. 413 (E.D.Mich.1990). Plaintiff has pleaded that the disclosures which are the subject of this lawsuit occurred after the Department became aware of several prior disclosures regarding this plaintiff and several requests for investigation and correc-

---

**16.** Similarly, the settlement cannot be regarded as entitling the Department to release confidential information that is otherwise protected by the Privacy Act. Only the information contained in the letter that accompanied the settlement stipulation can be regarded as available for disclosure.

**17.** At a minimum, further discovery on this issue may be needed. The Court has discretion to deny a motion for summary judgment where the non-moving party cannot present facts essential to justify its opposition because such facts are in the possession of the moving party and additional discovery is warranted. Fed. R.Civ.P. 56(f).

tive action, and he has therefore satisfied this requirement.

The Department argues that subsection (e)(10) of the statute cannot mean what it plainly appears to say because if that were so the provisions of subsection (b) would be largely redundant, and the Department goes on to contend that "the more specific remedy provided in subsection (b) governs the more general provision, subsection (e)(10)." Defendant's Memorandum at 23–24. The general principle asserted by the Department is unimpeachable; but with respect to the issue of allegedly inadequate safeguards to insure the confidentiality of records against hazards which could result in harm, embarrassment, inconvenience, or unfairness to an individual (such as this plaintiff), subsection (e)(10) is the more specific provision, subsection (b) the more general. Thus the former governs, and the motion must be denied also with respect to the second claim in the complaint.

### V

Plaintiff also sues for alleged violations of his rights under the Fourth, Fifth, and Ninth Amendments to the Constitution. However, as the Department correctly points out, for purposes of these claims it is not a suable entity. *Blackmar v. Guerre*, 342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534 (1952). Further, if the United States were to be substituted for the Department of Justice as the defendant, sovereign immunity principles would bar the action. *See Lombard v. United States*, 690 F.2d 215, 227 (D.C.Cir.1982). It follows that the third claim must be dismissed.[18]

### VI

For the reasons stated, the defendant's motion is granted in part (with respect to the third claim) and denied in part (with respect to the first and second claims).

18. Plaintiff does not seriously contest these conclusions, arguing only that the proper remedy is to permit him to amend his complaint to assert the appropriate cause of action against the government employee responsible for the wrongful disclosure. Plaintiff's constitutional

### ORDER

Upon consideration of defendant's motion to dismiss or in the alternative for summary judgment, the opposition and reply thereto, and in accordance with the Memorandum issued this date, it is this 28th day of May, 1992

ORDERED that defendant's motion is granted with respect to the plaintiff's third claim; and it is further

ORDERED that defendant's motion is denied with respect to plaintiff's first and second claims.

claims against the Department are dismissed, and if plaintiff wishes to move to amend his complaint to add claims against individual government employees, the Court will deal with any problems with such an amendment at the appropriate time.