Roger PILON, Appellant,

v.

UNITED STATES DEPARTMENT
OF JUSTICE, Appellee.

No. 95–5086.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 22, 1995.

Decided Jan. 16, 1996.

Matthew L. Myers, Washington, DC, argued the cause and filed the briefs, for appellant.

Alfred Mollin, Attorney, United States Department of Justice, argued the cause for appellee, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, Robert E. Kopp, Attorney, and Leonard Schaitman, Attorney, were on the brief. Jeffrey F. Axelrad, Attorney, entered an appearance.

Before: WALD, RANDOLPH and
ROGERS, Circuit Judges.

WALD, Circuit Judge:

This is a case about the meaning of "disclose," as that term is used in the Privacy Act of 1974. In particular, we consider under what circumstances Congress intended that "disclose" encompass the dissemination of a document to someone who is already familiar with it. The district court granted appellee Department of Justice summary judgment in this Privacy Act suit, reasoning that the agency's unauthorized release of a protected record to one of its former employees was not a disclosure because the recipient was already familiar with the document from his time in government service. We reverse. While this court interpreted "disclose" in *Hollis v. United States Department of the Army*, 856 F.2d 1541 (D.C.Cir.1988), not to include the dissemination by an agency of a protected document to one who had already legitimately been given the same information by the agency, we now decline to extend *Hollis* beyond the limited factual circumstances that gave rise to it. *Hollis*, read contextually, does not sanction the unauthorized release of protected records to former agency employees, and to extend its reasoning to the facts of this case would create a gaping hole in the protective orbit of the Privacy Act. Accordingly, we hold that the Department's transmission of a protected record in this case to its former employee constituted a disclosure. As a separate matter, even were we to adopt the more limited construction of "disclose" applied in *Hollis* in this case, we would still conclude that summary judgment was not appropriate because the Department did not present sufficient evidence that the former employee in fact remembered the document's material contents in detail at the time it was sent to him.

## I. BACKGROUND

A. *The Privacy Act and* Hollis' *Interpretation of "Disclose"*

The Privacy Act of 1974 ("the Act") establishes conditions under which certain kinds of agency documents must be kept private and may be disclosed only to authorized individuals. *See* 5 U.S.C. § 552a(b) (1994). The Act provides:

No agency shall *disclose* any record which is contained in a [Privacy Act] system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains....

*Id.* (emphasis added). Not every disclosure gives rise to liability, however; the Act itself sets out several exceptions that allow agencies to utilize protected records for their legitimate needs. For example, agencies may lawfully disclose a Privacy Act record both to employees "who have a need for the record in the performance of their duties," *id.* § 552a(b)(1), and for "routine use[s]" that are "compatible with the purpose for which it was collected," *id.* § 552a(b)(3), 552a(a)(7). If no such exception applies, however, an agency is liable for an intentional or willful disclosure that has some adverse effect upon the subject of the record. *Id.* § 552a(g)(1)(D), 552a(g)(4).

Hardly a model of legislative "precision and tailoring," the Act was passed as a result of a late-session congressional compromise, with several of its central terms lacking express definition. *See generally* 2 JAMES T. O'REILLY, FEDERAL INFORMATION DISCLOSURE § 20.01 (2d ed. 1990). The courts thus have been required to engage in substantial interpretative efforts, as government agencies have sought to accommodate their record-keeping operations to the constraints that a literal reading of its terms might impose. *See, e.g., infra* note 7 and accompanying text (citing cases).

Perhaps the most critical term left undefined by the Act is "disclose," and among the interpretative questions that term raises is whether it encompasses the release of an otherwise protected record to an individual who is already familiar with its contents. Several federal courts have concluded, in a variety of diverse circumstances, that such a release of information does not give rise to liability under the Act, averring the "common sense" notion that it is not possible to "disclose" something to someone who already knows it. *See, e.g., Quinn v. Stone*, 978 F.2d 126, 134 (3d Cir.1992); *Kline v. Department of H.H.S.*, 927 F.2d 522, 524 (10th Cir.1991);

*Hollis,* 856 F.2d at 1545; *Reyes v. Supervisor of D.E.A.,* 834 F.2d 1093, 1096 n. 1 (1st Cir.1987); *Pellerin v. Veterans Admin.,* 790 F.2d 1553, 1556 (11th Cir.1986); *F.D.I.C. v. Dye,* 642 F.2d 833, 836 (5th Cir. Unit B 1981).

This restricted interpretation of "disclose" was applied by this circuit in *Hollis v. United States Department of the Army,* 856 F.2d 1541 (D.C.Cir.1988). In that case, Phyllis Hollis requested and received from the Army a summary of individual child-support payments previously deducted from her ex-husband's salary and sent directly to her. She needed the summary to establish in court that her ex-husband was in arrears in furnishing child support. Mr. Hollis then filed suit against the Army, arguing that the summary was a protected record that had been unlawfully disclosed under the Privacy Act. The district court granted the Army summary judgment, and we affirmed, reasoning that "Phyllis Hollis, as the direct recipient of the child-support payments, already knew what had been remitted to her." *Id.* at 1543.

### B. The Pilon Case

The present appeal involves appellant Roger Pilon's claim that appellee Department of Justice ("the Department") violated his rights under the Privacy Act when one of its employees faxed a confidential memorandum to Peter Nowinski, a private citizen, who in turn passed it on to a reporter. In defense, the Department invokes *Hollis,* arguing that Nowinski, a former Department employee, was already familiar with the document from exposure to it while in government service. While these are the basic determinative facts governing the "disclosure" question, we set forth a somewhat more detailed factual background, which the parties do not dispute, to place the Privacy Act issue in context.

#### 1. The Allegation and First Vindication

In March 1987, Roger Pilon was named the Director of the Asylum Policy and Re-

view Unit of the Department of Justice. Soon thereafter, his wife was nominated to be an Assistant Secretary of the Department of the Interior. In January 1988, however, both were informed that they were the subjects of a Federal Bureau of Investigation ("F.B.I.") inquiry into whether they had illegally given a classified document to a foreign government. Pilon was then placed on administrative leave from the Department,[1] and in April of that year, the Reagan Administration withdrew his wife's nomination.

At the close of the nine-month investigation, the F.B.I. declined to recommend that a criminal prosecution be instituted. The Office of Professional Responsibility ("O.P.R.") of the Department of Justice then conducted its own inquiry, and ultimately recommended that Pilon be asked to resign or, if he refused, that his appointment be terminated. The Pilons, who for security reasons have never been informed of the evidence underlying the allegations, adamantly denied any wrongdoing. They therefore arranged for their personal attorney (who had a security clearance) to review the evidence underlying the allegations and prepare a rebuttal. After reviewing the rebuttal, the Attorney General ordered that a *de novo* review of the matter be conducted.

That review was completed in the Fall of 1988 as communicated in a letter to Pilon, which stated in full:

> This is to inform you that the investigations undertaken by the Federal Bureau of Investigation and the Office of Professional Responsibility have now been completed. You will be reinstated as Director of the Office of Asylum Policy and Review as of September 19, 1988. No implication adverse to you should be taken from the investigations.
>
> I want to thank you for the outstanding cooperation and patience you have demon-

---

1. The Department's brief on appeal, at 5, represented that Pilon was placed on leave after taking a polygraph examination. In his reply brief, at 1–2, Pilon protested that he had been placed on leave *before* the examination, and that the Department's erroneous statement of the facts left the impression that he had failed the polygraph examination and been placed on leave as a

result. Counsel for the Department then wrote to the court to acknowledge the error. *See* Letter from Alfred Mollin, Senior Appellate Counsel, Civil Division, to Mark J. Langer, Clerk, U.S. Court of Appeals for the D.C. Circuit (Nov. 16, 1995). We accept the Department's representation that the error was inadvertent, but nonetheless note it in order to correct the record.

strated during this time. I look forward to your return.

Letter from Dee V. Benson, Principal Associate Deputy Attorney General, to Roger Pilon (Sept. 9, 1988), *available in* Joint Appendix at 64. Though Pilon was reinstated in full—with his Top Secret security clearance intact—within a month, he elected to leave the Department for a position with a private organization.

During this period of time, information to the effect that the Pilons were under investigation apparently was twice leaked to the media: once at the outset of the *de novo* review, and again after the Pilons were cleared. Neither leak resulted in a published news story.

## 2. *The Second Vindication*

With the closure of the *de novo* review, it appeared that the Pilons had put this matter behind them. In November 1989, however, the Department released O.P.R.'s 1988 *Annual Report to the Attorney General* ("the *Report*"), which published the allegations for the first time. According to the *Report:*

Representative examples of misconduct investigated by the Office are as follows:

(1) A Departmental attorney holding a high security clearance was the subject of a foreign counterintelligence investigation. The information indicated that the employee may have been involved in the disclosure of classified information to a foreign government. The investigation did not develop sufficient evidence to support a prosecution, but did discover that sufficient cause existed to terminate his political appointment. The employee resigned prior to the initiation of removal proceedings.

Office of Professional Responsibility, Department of Justice, *Annual Report to the Attorney General (1988)* 6, *available in* Joint Appendix at 53, 60. Though the *Report* did not expressly identify Pilon, members of the press learned his name almost at once, and news stories detailing the investigation and its alleged results as set forth in the *Report* appeared the next day.

Pilon immediately requested that the inaccuracies in the *Report* be corrected. In re-

sponse, Attorney General Thornburgh directed Deputy Attorney General Donald B. Ayer to investigate the matter. That investigation was completed in early 1990, at which time Ayer wrote to the Pilons' attorney, stating:

I have concluded that, although the Report did not name your client, Roger Pilon, as the subject of the investigation in question, he in fact was the subject, information which later became public. Mr. Pilon is entitled to an apology because of two errors contained in the report and the accompanying publicity. First, contrary to the statement in the third sentence in the relevant paragraph of the report, the investigation of Mr. Pilon did not produce sufficient evidence to warrant his dismissal. Mr. Pilon was invited to return to his former post unconditionally. Second, contrary to the statement in the fourth and final statement in the paragraph, Mr. Pilon did not resign in the face of imminent removal proceedings.

We regret the mistakes contained in the OPR Report.

The Department further deeply regrets any pain or inconvenience that the passage in the OPR Report may have caused Mr. and Mrs. Pilon.

Letter from Donald B. Ayer to Matthew L. Myers (Mar. 16, 1990), *available in* Joint Appendix at 76.

Within the Department, the investigation was memorialized in a classified report, as well as a confidential memorandum from Ayer to the Attorney General. It is that memorandum that lies at the heart of this lawsuit.

## 3. *The Third Vindication*

Soon after receiving the letter, the Pilons entered into discussions with the Department about making public the fact that the O.P.R. *Report* was erroneous. Without the approval of the Attorney General, Deputy Attorney General Ayer then wrote the Pilons' attorney a second letter, which stated in part:

[M]y office's involvement has been limited to the conduct of an investigation concluding, among other things, that the OPR report was erroneous in certain particu-

lars, but that [OPR General Counsel] Michael Shaheen and OPR cannot be faulted in any way for the publication of incorrect information.

Letter from Donald B. Ayer to Matthew L. Myers (Apr. 30, 1990), *available in* Joint Appendix at 77. After learning of the letter, the Attorney General instructed Ayer to withdraw it formally, but he refused. Very soon thereafter, both Ayer and his principal deputy, Peter Nowinski, resigned from their positions within the Department, in part over the Pilon matter.

At around the same time, the Pilons entered into a settlement agreement with the Department over the errors in the O.P.R. *Report.* In it, the Department agreed to pay the Pilons $25,000 to cover any claims of damage as well as attorney's fees. Further, the Department agreed to write yet another letter expressly stating that the Pilons had been vindicated, and to instruct its employees not to state otherwise. The letter explained:

Notwithstanding Mr. Ayer's communication of correction and apology, we have become aware that the situation of the Pilons was aggravated by recent reportage that has perpetuated, rather than clarified, the confusion created by the Department. Accordingly, the Attorney General delegated to me the authority to conduct a final investigation into this unfortunate matter and to make a definitive statement concerning Mr. Pilon.

As a result of my investigation, I have reached the same conclusion described to you by Mr. Ayer regarding the inaccuracy of the statements in question in the OPR Report and the apology due the Pilons. The Attorney General concurs. Thus, the Department of Justice states that, notwithstanding the 1988 OPR *Annual Report,* or any media reports identifying Mr. Pilon: (1) the 1988 investigation of Mr. Pilon did not produce evidence sufficient to warrant his dismissal from the Department....; (2) following the 1988 investigation, Mr.

Pilon in fact had been restored unconditionally to his position as Director of the Justice Department's Asylum Policy and Review unit ...; and (3) his subsequent resignation was self-initiated and was not made in the face of removal proceedings (which in fact never had been contemplated or ordered). His subsequent resignation was entirely of his own initiation to further his career.

The Department intends and hopes that this unequivocal statement will remedy any confusion caused by our previous errors and the improper disclosure of the Pilons' identities, and again apologizes for any suffering or inconvenience that the Department caused to Mr. Pilon and to Mrs. Pilon.

Letter from Stuart M. Gerson, Assistant Attorney General, to Matthew L. Myers (July 12, 1990) 1–2, *available in* Joint Appendix at 79A–B. Within a week, the *New York Times* and *Washington Post* carried stories explaining that the O.P.R. *Report* had been erroneous and that the Pilons had been vindicated. *See Former Justice Department Official Vindicated,* WASH. POST, July 17, 1990, *available in* Joint Appendix at 82; *Settlement Reached in Justice Dept. Spying Inquiry,* N.Y. TIMES, July 17, 1990, *available in* Joint Appendix at 80. Again, the matter seemed closed.

## C. *The Present Dispute*

It was not. Within two days of those press reports, Peter Nowinski spoke with O.P.R.'s Deputy Counsel, Richard M. Rogers. Nowinski, by then a private attorney, requested that Rogers provide him with the cover memorandum that Deputy Attorney General Ayer had sent to the Attorney General ("the Ayer memorandum") after reviewing the O.P.R. *Report.* Rogers then retrieved the confidential document from the Department's secured files and faxed it to Nowinski[2]; he did not place any limits on Nowinski's use of it. In

---

**2.** Apparently, a second release of the memorandum nearly occurred when O.P.R. General Counsel Michael Shaheen attempted to provide it, along with materials detailing the settlement with Pilon, to Ayer, after Ayer had resigned from

the Department. Ayer, however, apparently declined the offer, and immediately returned the document to Shaheen. *See* Deposition of Donald B. Ayer 108–10, *available in* Joint Appendix at 147, 155P–R.

the confidential memorandum, Ayer had written:

I conclude that the following critical points should be taken as established:

1) Mr. Pilon was in fact reinstated unconditionally (and the OPR recommendation that he be dismissed was overruled) . . . ;

2) That action was taken notwithstanding the existence of evidence that was sufficient to justify Pilon's dismissal;

3) The conclusion of the Deputy's office that Mr. Pilon should be unconditionally reinstated was never communicated to anyone in OPR, although it was memorialized in writing and constituted an overruling of the OPR recommendation. . . .

4) . . . There does not appear to be any significant basis on which to fault OPR for either the format or the content of the 1988 report, in light of the impression they were left with by the Deputy's Office.

. . . I believe that we should reject requests to pay attorney fees or to undertake a leaks investigation. I find no basis for concluding that anyone at OPR has conducted himself inappropriately.

Memorandum from Donald B. Ayer to the Attorney General (Jan. 24, 1990) 1–2, *available in* Joint Appendix at 88–89.[3]

Nowinski in turn faxed the memorandum to two members of the press, one of whom passed it on to an Associated Press reporter. The Associated Press in due course carried an article, based on both the memorandum

and statements by unnamed officials, to the effect that Attorney General Thornburgh had overruled a Department of Justice staff recommendation that the Department not enter into a settlement with Pilon. *See* James Rowley, *Thornburgh Overruled Aides in Awarding Ex–Employee $25,000*, A.P. Wire, Oct. 15, 1990, *available in* Joint Appendix at 90. Specifically, the article stated that

[a] senior department lawyer who reviewed the case of Roger Pilon concluded that there was evidence to support his firing and that he was not entitled to reimbursement for his legal bills, according to a memo to Thornburgh obtained by The Associated Press.

*Id.* The article also recounted earlier statements made by Ayer to the effect that Thornburgh's decision was calculated to discredit O.P.R. and its General Counsel, Michael Shaheen, at a time that O.P.R. was investigating the conduct of two Thornburgh aides. The *Washington Times* carried the Associated Press story the next day. *See* Associated Press, *Thornburgh Overruled Own Lawyers on Pilon, Sources Say*, Wash. Times, Oct. 16, 1990, *available in* Joint Appendix at 93.

This series of events prompted Pilon to file suit against the Department of Justice, alleging that the Rogers–to–Nowinski facsimile constituted an unlawful disclosure under the Privacy Act.[4] The complaint sought $500,000 in actual and punitive damages, as well as attorney's fees and litigation costs. The Department then filed a motion to dismiss based on seven different grounds, all of which the district court rejected.[5] *See Pilon*

---

3. We have duly considered whether it is appropriate to include the text of this once-confidential memorandum in the body of this opinion. It is the damage allegedly caused by the memorandum's "disclosure," after all, that underlies Pilon's complaint. In the end, we have elected to include it as necessary to a full understanding of the case. Further, its substance has already been set out in press reports, and it is part of the public record in this case.

4. Pilon also argued that Nowinski's transmission of the memorandum to a reporter independently violated the Privacy Act, even though Nowinski was a private citizen at the time. Our disposition of the case makes it unnecessary to address this claim.

Pilon's complaint further alleged that the Department had failed to establish adequate safeguards to protect Privacy Act records, which is an entirely separate question under the Act. *See* 5 U.S.C. § 552a(e)(10). The district court's Memorandum Order did not address this issue, and we therefore do not consider it on appeal. It remains open for consideration on remand.

5. The Department invoked the following defenses unsuccessfully: the suit was barred by the earlier settlement agreement; the information was already public; the individual responsible for "disclosing" the information did so from his own personal recollection rather than the memorandum itself; Pilon's claims were all based on improper hearsay statements; and Pilon had failed to establish that the information had been

*v. United States D.O.J.*, 796 F.Supp. 7 (D.D.C.1992) (mem.).

After conducting substantial discovery, the parties filed cross-motions for summary judgment, which dealt principally with the "disclosure" issue in light of *Hollis* and related decisions of other courts. In a Memorandum Order, the district court granted summary judgment in favor of the Department. *See Pilon v. United States D.O.J.*, Civ.A. No. 90–2794 (D.D.C. Feb. 27, 1995) ("Mem.Ord."), *available in* Joint Appendix at 11. According to the district court:

> [T]he Rogers–to–Nowinski ... transfer cannot sustain an action under the Act because it is not a "disclosure" under the meaning of the Privacy Act because it did not disclose anything to Nowinski that he did not already know. Not only was Nowinski previously aware of the information in the [Ayer] Memorandum, he may have been its author or at least have been involved in its preparation.
>
> It is undisputed that Nowinski joined the Office of the Deputy Attorney General in January 1990 as the Principal Associate Deputy Attorney General and that, in that capacity, he was responsible for operating the office on a day-to-day basis. Nowinski has testified that since the Deputy Attorney General's Office had responsibility for investigation of plaintiff's claim against the Department, he was "quite confident that [he] would have at least seen or reviewed this document before it went to the Attorney General." Deputy Attorney General Donald B. Ayer also remembers discussing the Memorandum with Nowinski. Given this, the release of the document could not have been a "disclosure" under the Act because Nowinski had prior knowledge of its contents.

*Id.* at 2–3. Based on its conclusion that no disclosure had occurred under the Privacy Act, the district court did not consider whether Rogers' release of the document was willful or whether the release had an adverse effect on Pilon.[6] *Id.* at 1.

released by the agency. The Department does not appeal from the district court's ruling against it on those theories.

Pilon now appeals from the district court's ruling.

## II. ANALYSIS

### A. Congress Did Not Intend "Disclose" to Omit All Disseminations of Protected Records to Individuals with Prior Knowledge of their Existence or Contents

#### 1. Our Interpretative Framework

■ Our primary task, then, is to construe "disclose," as that term is employed in the Privacy Act of 1974. The Department presses a narrow reading, arguing that the release of a document *never* constitutes a disclosure if the recipient was already familiar with it, no matter who the recipient or what the document's substance. Pilon, in contrast, suggests a broader interpretation, which would deem the unauthorized dissemination of a document to a former employee a disclosure, even if the former employee is familiar with, and in fact fully recalls, the document. The Department's narrow reading of "disclose" focuses on the accuracy of the recipient's memory of the document, while Pilon's broader reading focuses on the legitimacy of the agency's act of dissemination and the circumstances of the recipient's prior exposure to the document.

Both parties recognize that we are not writing on a blank slate, given our earlier decision in *Hollis v. United States Department of the Army, supra.* Their dispute is, in large part, over how expansively we should read that decision. The Department emphasizes that while *Hollis* did not expressly adopt a general definition of "disclose," it did at one point refer approvingly to decisions of other courts that had interpreted the term narrowly. In discussing the district court's ruling in *Hollis,* we stated:

> Since the Army had remitted the child-support payments directly to Phyllis Hollis, the [district] court reasoned that she

**6.** The Department concedes that the Ayer memorandum was a "record which [was] contained within a system of records," 5 U.S.C. § 552a(b), for purposes of the Privacy Act. Brief for Appellee at 15 n. 6.

learned nothing from the transmitted record of which she was not already aware. Other courts have echoed the sentiment that when a release consists merely of information to which the general public already has access, or which the recipient of the release already knows, the Privacy Act is not violated.

856 F.2d at 1545 (footnotes omitted).

Pilon, however, argues that while *Hollis* may have in dicta indicated approval of other courts' narrow construction of "disclose," it had no reason to, and did not, mandate use of a narrow interpretation in all instances; its holding required no such pronouncement. In *Hollis*, the agency simply sent Mrs. Hollis a summary of the identical information that it had already lawfully provided her in the transmittal of the wage assignments from her husband's salary. According to Pilon, *Hollis* holds no more than that no disclosure occurs under the Privacy Act when an agency provides a private citizen with a document which itself merely recounts information that (1) the agency has previously, and lawfully, provided to her, and (2) she still fully recalls. *See* Brief for Appellant at 22.

We agree with Pilon that the determination of whether Congress intended "disclose" to be read so narrowly in all circumstances involving a recipient with prior knowledge of the protected record, including the facts presented here, was simply not involved in *Hollis*. That undertaking would have required a more intensive effort at statutory construction than *Hollis* engaged in, and would not have produced the result that the Department urges:

"On a pure question of statutory construction, our first job is to try to determine congressional intent, using traditional tools of statutory construction." *NLRB v. Food and Commercial Workers*, 484 U.S. 112, 123 [108 S.Ct. 413, 421, 98 L.Ed.2d 429] (1987). Our "starting point is the language of the statute," *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 5 [105 S.Ct. 2458, 2461, 86 L.Ed.2d 1] (1985), but " 'in expounding a statute we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' " *Massachu-*

*setts v. Morash*, 490 U.S. 107, 115 [109 S.Ct. 1668, 1673, 104 L.Ed.2d 98] (1989), quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 [107 S.Ct. 1549, 1555, 95 L.Ed.2d 39] (1987).

*Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990); *see also New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, —— U.S. ——, ——, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695 (1995) ("[W]e begin as we do in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs.").

In addition to that general formulation, we note that in interpreting the terms of the Privacy Act *specifically*, we have in the past taken particular care not to undermine the Act's fundamental goals. Recognizing the Act's varied ambiguities, we have consistently turned back "neat legal maneuver[s]," *Benavides v. U.S. Bureau of Prisons*, 995 F.2d 269, 272 (D.C.Cir.1993), attempted by the government that, while literally consistent with the Act's terms, were not in keeping with the privacy-protection responsibilities that Congress intended to assign to agencies under the Act. For example, in *Bartel v. F.A.A.*, 725 F.2d 1403 (D.C.Cir.1984), we found the Act applicable when an official disclosed his personal recollection of an investigation that he had instituted, despite the fact that he may not have reviewed the actual investigatory record before doing so. We recognized that earlier decisions had limited liability under the Act to instances in which the disclosed information had been "retrieved" from a system of records. On the facts then before us, however, that standard would have allowed an official to "circumvent [the Act] with respect to a record he himself initiated by simply not reviewing [the record] before reporting its contents or conclusions." *Id.* at 1409. We therefore found the retrieval rule inapposite in order to avoid an "interpretation [that] would deprive the Act of all meaningful protection of privacy." *Id.* at 1411.

More recently, in *Tijerina v. Walters*, 821 F.2d 789 (D.C.Cir.1987), the government invoked a provision that allows an agency to

exempt a system of records from certain requirements of the Privacy Act, 5 U.S.C. § 552a(j), as authority for exempting the records entirely from the Act's civil liability provisions. We rejected that interpretation, reasoning:

> The Act's statutory language, framework, and legislative history persuade us that the government is urging a completely anomalous use of the exemption provision that makes the Act a foolishness. The interpretation offered by the government would give agencies license to defang completely the strict limitations on disclosure that Congress intended to impose. We cannot agree that at the same time it forbade agencies to exempt systems of records from disclosure requirements, Congress intended them to be able to elude civil liability at their caprice. Agency exemption from civil liability is not in keeping with the language of the Act, and it serves none of the purposes behind the exemptions provision or the Act as a whole.

821 F.2d at 797.

The approach of *Bartel, Tijerina,* and like cases [7] informs our construction of the Privacy Act in this case as well. We are inclined to interpret "disclose" in a manner that will give effect to Congress' intent to protect the individual privacy of the subjects of protected records, except as to those disclosures authorized by the Act. *See* 5 U.S.C. § 552a (historical note) § (b)(5) (setting forth congressional statement of purpose that Privacy Act is intended to "permit exemptions ... only in those cases where there is an important public policy need for such exemption as has been determined by specific statutory authority").

### 2. *Plain Meaning*

We start with "the fundamental canon that statutory interpretation begins with the language of the statute itself." *Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 557–58, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). "Disclose" is, of course, sometimes employed in the narrow sense

that the Department proposes. Definitions include "to make known or public (something previously held close or secret)," WEBSTER'S NEW COLLEGIATE DICTIONARY 325 (1973), and to "open up to the knowledge of others; to make openly known, reveal, declare (*secrets,* purposes, beliefs, etc.)," 4 OXFORD ENGLISH DICTIONARY 737–38 (2d ed. 1989) (emphasis added).

But that is not the only or necessary meaning of "disclose." It can, as Pilon suggests, also encompass the *act* of exposing or disseminating an item, whether or not the recipient has prior knowledge of it; the term literally means to "dis-" or "un-" *close,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY. 645 (1966). In fact, an earlier version of the privacy bill defined "disclosure" as "the *transmission* of records or portions thereof, whether orally, by writing or by wire." H.R. 13872 (Apr. 2, 1974 version) (emphasis added). This interpretation of "disclose" is found in dictionary definitions as well, including "to expose to view <the curtain rises to [disclose] *once again* the lobby ... >," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra,* at 645 (emphasis added), and to "open up (that which is closed or shut); to unclose, unfold; to unfasten," 4 OXFORD ENGLISH DICTIONARY, *supra,* at 737. It has also been expressly employed by statute. *See* 50 U.S.C. § 426 (statute governing the protection of intelligence officers' and sources' identities; providing that "'disclose' means to communicate, provide, impart, transmit, transfer, convey, publish, or otherwise make available"). This usage neither is uncommon nor does it deviate from "ordinary meaning." For example, the annual form filed by a government employee setting forth her assets is still a "financial disclosure statement," even though it reveals identical information to that which the recipient knows from the employee's prior years' statements. Another example is found in the Office of Management and Budget guidelines for implementing the Privacy Act, which discuss an individual's request that an agency "disclose" certain records so that a

---

7. *E.g., Benavides v. U.S. Bureau of Prisons,* 995 F.2d 269, 272 (D.C.Cir.1993); *Doe v. Stephens,* 851 F.2d 1457, 1466 (D.C.Cir.1988); *Dickson v.* *O.P.M.,* 828 F.2d 32, 39 (D.C.Cir.1987); *Doe v. DiGenova,* 779 F.2d 74, 84–85 (D.C.Cir.1985).

third party may verify information that it already possesses. Office of Management & Budget, *Privacy Act Guidelines* 20 (July 1, 1975).

In support of its narrow reading of "disclose," the Department of Justice points us to *United States v. John Doe, Inc. I*, 481 U.S. 102, 107 S.Ct. 1656, 95 L.Ed.2d 94 (1987), which involved not the Privacy Act, but instead Federal Rule of Criminal Procedure 6(e), governing the secrecy of grand jury proceedings. *See* FED.R.CRIM.P. 6(e) (providing that individual with knowledge of grand jury proceedings "shall not *disclose* matters occurring before the grand jury, except as otherwise provided for in these rules" (emphasis added)). The Supreme Court held therein that no disclosure occurs when a government attorney who legitimately utilized grand jury materials in the course of a criminal investigation later reviews those same materials while preparing to represent the government in related civil proceedings. *John Doe, Inc. I*, 481 U.S. at 108–09, 107 S.Ct. at 1660–61.

The Court in *Doe*, however, referred to the "plain meaning of the term 'disclosure' *as used in this Rule*," *id.* at 110, 107 S.Ct. at 1661 (emphasis added), and it further carefully limited its holding as follows:

> [I]t is important to emphasize that the issue before us is only whether an attorney who was involved in a grand jury investigation ... may later review that information *in a manner that does not involve any further disclosure to others.*

*Id.* at 111, 107 S.Ct. at 1662 (emphasis added). In addition, it explicitly stopped well short of "addressing the very different matter of an attorney's disclosing grand jury information to others, inadvertently or purposefully, in the course of a civil proceeding." *Id.* The Court came nowhere close to holding that a government attorney who was exposed to grand jury materials while in government service may, without violating Rule 6(e), have them sent to him after he has retired and entered private practice. Such a holding would be directly contrary to the Court's conclusion that the Rule's plain meaning is to "prohibit[ ] those with information about the workings of the grand jury

from revealing such information to other persons *who are not authorized to have access to it under the Rule.*" *Id.* at 108, 107 S.Ct. at 1660 (emphasis added).

We are, in sum, not able to find that there is one plain meaning of "disclose" that settles the question of whether an unauthorized "disclosure" took place in this case.

3. *Express Statements of Congressional Purpose, Earlier Versions of the Act, and the Legislative History*

Dead-ended on the "plain meaning" route of statutory construction, we nonetheless do find substantial guidance within the Act—specifically in its "Congressional Findings and Statement of Purpose," which provide:

(a) The Congress finds that—

(1) the privacy of an individual is directly affected by the collection, maintenance, use, and *dissemination* of personal information by Federal agencies;

(2) the increasing use of computers and sophisticated information technology, while essential to the efficient operations of the Government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use or *dissemination* of personal information; .... and

(5) in order to protect the privacy of individuals identified in information systems maintained by Federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and *dissemination* of information by such agencies.

(b) The purpose of this Act ... is to provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies, except as otherwise provided by law, to—

(1) permit an individual to determine what records pertaining to him are collected, maintained, used, or *disseminated* by such agencies;

(2) permit an individual to prevent records pertaining to him obtained by such agencies for a particular purpose from being used or *made available* for another purpose without his consent; .... [and]

(4) collect, maintain, use, or *disseminate* any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose. . . .

5 U.S.C. § 552a (historical note) (emphasis added). Further, the particular provision of the Privacy Act at issue in this case, § 552a(b), which originated in the House of Representatives, is described in the House Report as prohibiting the *"dissemination* of records outside the agency except when requested or permitted with prior written consent by the affected individual," H.REP. No. 93–1416, *Privacy Act of 1974,* 93d Cong., 2d Sess. 25 (Oct. 2, 1974) (emphasis added).[8] *See also id.* ("Section (c) requires an accurate accounting of the fact and nature of any *dissemination* of a record. . . ." (emphasis added)).

The repeated references to the need to safeguard against "dissemination" of protected information, as well as the need to limit the improper uses of protected records, provide strong support for Pilon's broader interpretation of "disclose" as encompassing unauthorized dissemination outside of the circle of authorized recipients. *See* Brief for Appellant at 27 ("[Rogers] disseminated a record in a manner and for a purpose that was neither necessary nor lawful. . . ."). "Disseminate" carries with it no suggestion at all that the recipient must not previously be aware of the information transmitted, *e.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra,* at 656 ("to foster general knowledge of: BROADCAST, PUBLICIZE"), and while it is true that "disclose" is the controlling term in § 552a(b), that term is capable of both a narrow *Hollis*-type construction and a broader one more akin to the "dissemination" phrase employed so often in the Act's express statement of purpose. It seems appropriate in this circumstance to choose a meaning that will support, rather than undercut, the Act's main thrust.

There is, moreover, no support at all for the Department's interpretation of "disclose" in the statute's legislative history. Our review of the entire 1458 pages of the comprehensive *Legislative History of the Privacy Act of 1974* reveals not even a single tangential reference by any member of Congress, much less a clear statement in a congressional report, to the effect that the Act was not meant to bar the unauthorized release of documents to persons already familiar with their contents. The broader interpretation proffered by Pilon, in contrast, does evoke express support in the legislative history. According to the Senate Report, the Act

> requires every department and agency to insure, by whatever steps they deem necessary. . . . [t]hat they refrain from disclosing [a protected record] unless necessary for employee duties, or from *making it available outside the agency* without the consent of the individual and proper guarantees. . . .

S.REP. No. 93–1183, *Protecting Individual Privacy in Federal Gathering, Use and Disclosure of Information,* 93d Cong., 2d Sess. 2–3 (Sept. 26, 1974), U.S.Code Cong. & Admin.News 1974, pp. 6916, 6917–18 (emphasis added). The House Report echoes the same theme, emphasizing that

> [t]he consent requirement may well be one of the most important, if not the most important, provisions of the bill. No such transfer could be made unless it was pursuant to a written request by the individual or by his prior written consent. This requirement would apply to *all so-called "non-routine" transfers of information.*

H.REP. No. 93–1416, *supra,* at 12 (emphasis added).

---

**8.** In addition, the various drafts of the Senate bill all expressly utilized the term "disseminate" rather than "disclose" to refer to an agency's release of information. *See, e.g.,* S. 3418 § 201(a)(1), (5), 201(d)(5)(D) (May 1, 1974 version); S. 3418 § 201(b)(1) (Sept. 26, 1974 version). "Disclose" was inserted into the Senate bill only 24 hours before the final vote on the Act in order to conform to the House version. *See* Statement of Sen. Hruska (Dec. 17, 1974), *re*-

printed in LEGISLATIVE HISTORY OF THE PRIVACY ACT OF 1974, at 871 (1976). At approximately the same time, both chambers adopted an amendment that added § (e)(6) of the Act, which involves the accuracy of records released by agencies, and which utilizes the term "disseminat[e]" rather than "disclose." There is no suggestion in the legislative history that Congress intended the choice between "disclose" and "disseminate" to be substantive.

Moreover, the legislative history contains express indications that Congress intended liability to attach under the Act in circumstances strikingly similar to those of this case. According to the Senate Report:

> Subsection 201(b)(2). States that agencies shall require employees to refrain from disclosing records or personal data in them, within the agency other than to officers or employees who have a need for such record or data in the performance of their duties for the agency.
>
> This section is designed to prevent the office gossip, interoffice and interbureau leaks of information about persons of interest in the agency or community, or such actions as the publicizing of information of a sensational or salacious nature or of that detrimental to character or reputation.
>
> . . . .
>
> The section envisions that if an employee dealing with official information about a person is requested to surrender that person's record to someone who clearly has no need for it, he should decline or seek to define the purpose of the requested disclosure. One of the results of this section may be to promote a sense of ethical obligation on the part of Federal officials and employees to ascertain when improper disclosure of information within the agency may be sought or promoted for personal, political or commercial motives unrelated to the agency's administrative mission.

S.REP. No. 93–1183, *supra*, at 51–52, U.S.Code Cong. & Admin.News 1974, p. 6966. *Compare* Brief for Appellee at 23 ("Rogers gave the document to Nowinski, believing Nowinski to be the author of the document, because Nowinski asked for it, *expressing an understandable curiosity to compare present policy with past determinations.*" (emphasis added)) *with* S.REP. No. 93–1183, *supra*, at 1, U.S.Code Cong. & Admin.News 1974, p. 6916 ("[The Act] is designed to prevent the kind of illegal, unwise, overbroad, investigation and record surveil-

lance of law-abiding citizens produced in recent years from actions of some over-zealous investigators, *and the curiosity of some government administrators,* or the wrongful disclosure and use, in some cases, of personal files held by Federal agencies." (emphasis added)).

### 4. *Related Provisions of the Act*

Pilon's broader construction of "disclose" is also clearly preferable when considered in the context of the Privacy Act's general operation.[9] For example, the Act provides that an agency shall "disclose" records upon the written request of the individual to whom the record pertains. 5 U.S.C. § 552a(b). Under the Department's interpretation, an agency could technically refuse to "disclose" documents—*e.g.*, those containing income, address, and family history data—on the ground that the subject already knew the information contained in them. That result, of course, would completely contravene the Privacy Act's basic goals of making individuals aware of the types of records that the government was maintaining, *see id.* § 552a (historical note) § (b)(1) (identifying purpose to "permit an individual to determine what records pertaining to him are ... maintained"), and giving citizens greater control over their dissemination, *see id.* § (b)(2) (identifying purpose to "permit an individual to prevent records pertaining to him obtained by such agencies for a particular purpose from being used or made available for another purpose without his consent").

Further, the Department's narrow construction of "disclose," when used to shield the release of documents to former agency employees, becomes an easy tool for manipulating and circumventing the Privacy Act's limited exceptions to the bar against disclosure. Under the Act, an agency legitimately may disclose a protected record to an employee who has a need to use it in the course of his duties, 5 U.S.C. § 552a(b)(1), or pursuant to certain "routine uses," *id.* § 552a(b)(3).

---

**9.** *See United Savings Ass'n v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) ("Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (citations omitted)).

That statutory framework clearly does not contemplate that after reviewing the document under one of those exceptions, the employee may on a whim once again retrieve it from the agency's secured files and use it for whatever purposes he wishes because there has been no "disclosure." Yet that is exactly the import of the Department's position; having seen the document under permissible circumstances, the employee can never violate the Act in retrieving it and making whatever use he pleases of it. Moreover, according to the Department's interpretation of "disclose," once in possession of the document for the second time, that same employee could resign his position with the agency, take the document with him, and (as a private citizen) release the document broadly without anyone incurring liability under the Privacy Act.[10] These scenarios seriously undermine the "common sense" notion of *Hollis* and like cases that no harm can come from the release of a document to someone who is already fully familiar with it.[11]

And, indeed, that closely parallels what happened in this case. Nowinski came into contact with the Ayer memorandum in the course of his duties as Principal Associate Deputy Attorney General. Rather than taking the Ayer memorandum when he left the

Department of Justice, however, Nowinski arranged to have it faxed to him at his law office. Under either scenario, the Department's position converts a limited exception under the Privacy Act, which makes certain disclosures within the agency permissible, into virtually an absolute shield from liability. That result is a far cry from what we discern as Congress' intent. *See Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C.Cir.1988) ("It is by now well-established that agencies covered by the Privacy Act may not utilize the 'routine use' exception to circumvent the mandates of the Privacy Act."). Liability would attach only in the rare instance that an agency official was foolish enough to leak a document to someone other than a knowledgeable former colleague. The Act's bar to "disclosure" surely requires more. *See Dickson v. O.P.M.*, 828 F.2d 32, 39 (D.C.Cir. 1987) ("Finally, the broad scope of coverage of the Privacy Act makes it presumptively unlikely that Congress intended to grant so sweeping an exclusion by indirection."); *Doe v. DiGenova*, 779 F.2d 74, 84, 85 (D.C.Cir. 1985) (refusing to adopt interpretation that "would create a gaping hole in the overall scheme of the Privacy Act"; noting that "it is inconceivable that Congress intended to

---

**10.** This case does not present the question of whether an agency may, consistent with the Privacy Act's disclosure provisions, release a document that has already been fully aired in the public domain through the press or some other means. We do note, however, that the Privacy Act approves those disclosures that are "required" under the Freedom of Information Act ("FOIA"), *see* 5 U.S.C. § 552a(b)(2), and that under various FOIA exemptions, prior publication is a factor to be considered in determining whether a document properly is to be released. *See, e.g., United States D.o.D. v. F.L.R.A.*, — U.S. —, —, 114 S.Ct. 1006, 1015, 127 L.Ed.2d 325 (1994); *United States D.o.D. Dep't of Military Affairs v. F.L.R.A.*, 964 F.2d 26, 30 n. 6 (D.C.Cir. 1992) ("Whereas a federal agency typically can disclose *more* information than that required to be disclosed under the FOIA, in responding to a FOIA request for personal information about its employees, a federal agency can only disclose information that it would be *required* to disclose under the FOIA. For an agency to do otherwise would violate the prohibition on disclosure in the Privacy Act." (citation omitted)).

**11.** The Department contends that the spectre of wholesale release of protected records is not a

realistic possibility if the district court's opinion is affirmed, because of the added privacy protection provided by various Department of Justice regulations and policies. One such policy, J.M.D. Order 2710.3A (Dec. 9, 1980), creates a scheme through which the agency reviews employees' requests to remove records when they leave the Department. There is no suggestion in the record that either Nowinski or Rogers received any such clearance. Further, that program does not make any provision for the subject of a wrongfully removed record to seek damages, which is an essential component of the Privacy Act. Moreover, it does not address the dissemination of a sensitive document by a current employee, which is what happened in this case. Restriction on dissemination by current employees is apparently governed by a series of federal regulations. *See* 28 C.F.R. §§ 16.40–57 (1995). We note, however, that these regulations, like the Privacy Act itself, bar only "disclosure." *See, e.g., id.* § 16.57(b) ("[A]n employee of the Department of Justice shall ... [d]isclose no record to anyone, except a component, for any use, unless authorized by the [Privacy] Act."). Given that "disclose" presumably carries the same meaning in the statute and the regulations, the conduct proscribed would appear to be identical.

allow disclosure pursuant to every private litigant's whims"). And the deterrent value of its civil liability provisions should not be so casually sacrificed to problematic semantics. *See* S.REP. No. 93–1183, *supra*, at 82 U.S.Code Cong. & Admin.Code 1974, p. 6996 (describing civil liability provisions as "doubly important since the revised bill gives no enforcement authority to the [Privacy] Commission").

### 5. *The Limited Scope of* Hollis

 Our review of the Privacy Act's purposes, legislative history, and integrated structure convinces us that Congress intended the term "disclose" to apply in virtually all instances to an agency's unauthorized transmission of a protected record, regardless of the recipient's prior familiarity with it. Yet, as we have previously noted, *Hollis* might seem at first blush to represent an exception to that principle, and certainly its expansive language in places transcends such a limitation. Whatever our doubts about the breadth of the rationale employed in *Hollis*, however, we can accommodate its holding to our conclusion as to congressional intent, and at the same time decline to extend that holding to such a totally different situation as that presented here. The central difference between *Hollis* and this case is that the first disclosure outside the agency to Mrs. Hollis was a legitimate, authorized dissemination of wage-assignment information, presumably falling within the "routine use" exception. The second disclosure of the summary of the earlier payments, according to the court, revealed nothing, and thus contradicted no policy of the Act. In contrast, we hold today that an agency's unauthorized release of a protected record does constitute a disclosure under the Privacy Act except in those rare instances, like *Hollis*, where the record merely reflects information that the agency has previously, and lawfully, disseminated outside the agency to the recipient, who is fully able to reconstruct its material contents.

### B. *Even Under the Narrow* Hollis *Interpretation of "Disclose," Summary Judgment Would Still be Inappropriate*

Even were we to conclude that the district court appropriately extended *Hollis'* inter-

pretation of "disclose" to immunize the release of known information to an agency's former employee, we would nonetheless hold that summary judgment should not have been granted in this case. A predicate to disposition by summary judgment is that "there is no genuine issue as to any material fact." FED.R.CIV.P. 56(c). The Department did not satisfy that standard, because it failed to adduce sufficient evidence that Nowinski in fact recalled the material contents of the Ayer memorandum in detail at the time Rogers faxed it to him.

The interpretation of "disclose" set forth in *Hollis*, viewed most charitably, makes sense only if the information furnished is limited to material with which the recipient is already fully cognizant. It is not "common sense" that one who remembers *part* of a document can be given the entire contents on request because he has some sense of what it is about. Further, generalizations about the recipient's familiarity with similar documents are insufficient. At a minimum, the recipient must remember the material contents of the released record in detail. In *Hollis*, for example, the material substance of the summary provided by the Army was the list of child-support payments, with which Mrs. Hollis was fully familiar. *See Hollis*, 856 F.2d at 1545 ("Phyllis Hollis ... learned nothing from the transmitted record of which she was not already aware."). The fact that the summary may have been in a format that she had never seen before was unrelated to the information that the Privacy Act sought to protect.

There is also an implicit question of timing; from what point in time should we measure the adequacy of the recipient's memory to ascertain if a disclosure has occurred? Is it enough that the recipient once knew everything about the document but has since forgotten it, or must he accurately remember its substance to meet the nondisclosure standard? Here the "commonsense" interpretation employed by the district court—that one cannot "disclose" something to someone who already knows it—prevails. Inescapably, it seems to us, the recipient's knowledge must be measured at the time of the document's

release. It is thus somewhat remarkable that the Department took the position in this litigation that "[t]here can be no disclosure of a memorandum to a person who wrote or edited the same document," Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment, *Pilon v. United States D.O.J.*, No. 90–2794 (filed Apr. 29, 1994) 18, regardless of the individual's present memory of its contents. It would be one thing if the recipient's memory allowed him to reconstruct the document's material contents. But it is something else again if the recipient has forgotten some material aspect of the document, or has lost confidence in his recollection of it. Release would then, it seems to us, clearly constitute a disclosure under any reasonable definition of that term.

It is on this issue of timing that we conclude the district court erred, even under the standard applied in *Hollis.* According to the Department, "because Nowinski had prior knowledge of the information contained in the Ayer memorandum, and, indeed, had probably drafted it, there was no disclosure in Rogers' transmission." Brief for Appellee at 20. As we just noted, however, it is Nowinski's memory at the time he received the facsimile, not his participation in the document's preparation, that is determinative. Further, the Department's characterization of Nowinski's recollection is belied by his own sworn deposition testimony [12]:

Q Did you have any role in the drafting of this memorandum?

A More than likely. *I don't specifically recall.*

Q Did you—let me—let's reword that question. To the best you can remember, what was your role in the preparation of that memorandum or review of that memorandum?

A *I don't recall anything about the preparation of the memorandum.* What I do recall is that almost everything that left the Deputy's Office, I had a hand in.

Q Do you have any specific—

A I can't think of any exceptions.

Q Do you have a specific recollection of that memo?

A Yes. I have a recollection of it. *Parts of it are different than I recall,* but I have a recollection of it.

Q Are you confident that you would have at least seen or reviewed this memorandum before it went to the Attorney General?

A Quite confident. Quite confident.

Nowinski deposition at 28–29 (emphasis added) (appended to Defendant's Motion for Summary Judgment, *Pilon,* No. 90–2794 (filed Apr. 29, 1994), at tab 16).

Even if by stating that "[p]arts of [the memorandum] are different than I recall" Nowinski meant that his memory was unclear at the time of the deposition—as opposed to the time that he received the facsimile copy from Richard Rogers—the Department would not be entitled to summary judgment, for the case's procedural posture makes any such inference in favor of the Department inappropriate. It is the agency that bears the burden of proof when it seeks to invoke the holding of *Hollis;* given that the purpose of the Act is to promote privacy rather than disclosure, *see* Part II–A, *infra,* it would run against normal burden of proof principles and be unduly burdensome to require a plaintiff to negate a presumption that the recipient was already familiar with the information released by the agency. *Cf. Occidental Petroleum Corp. v. S.E.C.,* 873 F.2d 325, 342 (D.C.Cir.1989). Thus, as the nonmoving party on this issue, Pilon, not the Department of Justice, is entitled to have factual inferences drawn in his favor. *See Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994).

12. The district court adopted the Department's characterization of the facts on the ground that Pilon did not contest the issue. *See* Mem.Ord. at 3 n. 3. The record reflects, however, several points at which Pilon argued that there was no evidence that Nowinski recalled the document's material contents at the time Richard Rogers faxed it to him. *See Plaintiff's Reply to Defen-*dant's Opposition to Plaintiff's Motion for Summary Judgment, *Pilon,* No. 90–2794 (filed May 27, 1994) 8; *id.* at 23; *id.* at 23 n. 5; Reply to Defendant's Response to Plaintiff's Statement of Material Facts as to Which Plaintiff Contends There is no Genuine Controversy, *Pilon,* No. 90–2794 (filed May 27, 1994) 6.

Our conclusion that, at the least, Nowinski was not proven to recall the material contents of the Ayer memorandum at the time he received the facsimile is buttressed by his motivation in asking Richard Rogers to provide it to him. It is not disputed that Nowinski explained to Rogers that he "wanted to compare what was in that memo with the settlement agreement." Rogers deposition at 97 (appended to Defendant's Motion for Summary Judgment, *supra*, at tab 18). If Nowinski fully recalled the memorandum's contents, he would have had no need to see a copy of it in order to make that comparison.[13] Again, it would require a substantial, and improper, inference in the Department's favor to rule otherwise.

### III. Conclusion

█ We conclude that the district court erred in extending the reach of *Hollis* to encompass a federal agency's unauthorized release of a protected record to a former employee who first became familiar with its contents in the course of his official duties. Further, even under the more restrictive interpretation of "disclose" set out in *Hollis*, and applied by the district court, the Department was not entitled to summary judgment because it failed to adduce sufficient evidence that Peter Nowinski remembered and could reconstruct the document's material contents in detail at the time he received it. We therefore vacate the grant of summary judgment. Because the district court has not yet addressed some elements of Pilon's Privacy Act complaint (*e.g.,* whether the disclosure was willful and whether Pilon suffered any adverse effect), however, we remand the case for further proceedings.

*Vacated and remanded.*

---

**13.** *Hollis* is not to the contrary. Mrs. Hollis requested the payment summary so that she would have documentary evidence to use in pending litigation, *see* 856 F.2d at 1545, not to refresh her recollection. In fact, *Hollis* expressly recognized as "a general trait of human behavior" that, absent special circumstances, one does not request a document with which one is already fully familiar. *Id.*